UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>In re: StockerYale</u>                    Civil No. 05-cv-177-SM
<u>Securities Litigation</u>               Opinion No. 2006 DNH 109

**O R D E R**

Plaintiffs in this class action bring suit against
StockerYale, Inc., its Chief Executive Officer (Mark W.
Blodgett), its Chief Financial Officer (Francis J. O'Brien), its
Chief Operating Officer (Ricardo A. Diaz), and one of its
directors (Lawrence W. Blodgett).  Plaintiffs' First Amended
Complaint (document no. 18) alleges: violations of section 10(b)
of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and
Rule 10b-5 (17 C.F.R. § 240.10b-5), by StockerYale and Mark
Blodgett (Count I); violations of section 20A of the Act (15
U.S.C. § 78t-1), by StockerYale, Mark Blodgett, and Lawrence
Blodgett (Count II); and violations of section 20(a) of the Act
(15 U.S.C. § 78t(a)), by Mark Blodgett, Diaz, and O'Brien (Count
III).  The crux of plaintiffs' claim is that StockerYale issued
false or misleading press releases on April 19 and 21, 2004,
which resulted in a dramatic increase in the price of StockerYale
shares, and that Mark Blodgett and Lawrence Blodgett unlawfully
benefitted from their knowledge of the falsity of those press
releases by selling StockerYale shares the day after the first
press release was issued, shortly before it's accuracy was called

into question in the media, and near the peak of the stock's brief spike in price.

Before the court are: a motion to dismiss filed by StockerYale and Mark Blodgett (document no. 20); a motion to dismiss filed by Lawrence Blodgett, Diaz, and O'Brien (document no. 22); and a motion to strike portions of the memorandum of law in support of document no. 20 as well as two exhibits appended thereto (document no. 24). For the reasons given, defendants' motions to dismiss are denied and plaintiffs' motion to strike is granted.

## Motion to Strike

Plaintiffs move to strike two exhibits appended to defendants' legal memorandum, as well as various references to facts in that memorandum. Specifically, plaintiffs object to defendants' reliance on: (1) a "market commentary" titled "Near-Term Spotlight – The Security Industry," by Paul Tracy, editor of StreetAuthority Market Advisor (Defs.' Mem. of Law (document no. 21), Ex. F); (2) a set of six graphs purporting to depict prices of six different "microcap security stocks" (id., Ex. G); and (3) various factual allegations supporting defendants' interpretation of the press releases that plaintiffs claim to have been false or misleading.

"The fate of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four corners of the plaintiff's complaint." Young v. Lepone, 305 F.3d 1, 10–11 (1st Cir. 2002).  However, "[w]hen the factual allegations of a complaint revolve around a document whose authenticity is unchallenged, 'that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).'"  Id. at 11 (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998); citing 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 12.34[2] (3d ed. 1997)).  As well, the Federal Rules of Evidence permit a court to take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).

**Market commentary.**  The "market commentary" attached as Exhibit F to defendants' memorandum of law was published on April 12, 2004 – five days before the first StockerYale press release was issued – and it discusses the "red-hot" performance of several stocks in the "security sector."  Plaintiffs move to strike Exhibit F on grounds that it is not relevant to their complaint and is also immaterial, irrelevant, and inadmissible as both opinion testimony and hearsay.  Defendants counter that the article is background information subject to judicial notice

under FED. R. EVID. 201(b), and is "pertinent to the action."  In
re Polaroid Corp. Sec. Litig., 134 F. Supp. 2d 176, 182 (D. Mass.
2001).

The disputed market commentary is not "pertinent to the
action" because it is not a document on which plaintiffs' action
is based.  See id. (citing Romani v. Shearson Lehman Hutton, 929
F.2d 875, 878 (1st Cir. 1991); Fudge v. Penthouse Int'l, Ltd.,
840 F.2d 1012, 1015 (1st Cir. 1988)).  Nor are the editorial
comments and analysis contained in the commentary about overall
trends in the security sector the kind of information that is
subject to judicial notice.  See Kramer v. Time Warner, Inc., 937
F.2d 767, 773 (2d Cir. 1991) ("The [district court's]
illustrative reference to the condition of the junk bond market
was thus not a ground for decision and does not run afoul of the
rule that a district court must confine itself to the four
corners of the complaint when deciding a motion to dismiss under
Rule 12(b)(6).").  And, while the strictly factual information
contained in the market commentary describing the market
capitalization and earnings of EFJ Incorporated, NAPCO Security
Systems, IPIX Corp., Arotech Corp., and Magal Security Systems is
probably subject to judicial notice, because that information
consists of facts "capable of accurate and ready determination by
resort to sources whose accuracy cannot reasonably be

questioned," FED. R. EVID. 201(b), defendants have not shown how such information is relevant to the pending motions.

**Stock price data.**  Attached as Exhibit G to the memorandum is a set of graphs titled, collectively, "April 2004 Stock Prices of Comparable Microcap Security Companies," which purports to show the stock prices for Alanco Technologies, Arotech, Bulldog Technologies, ComCam, Inc., ICTS International, and Metal Storm Ltd. about the time StockerYale issued the two disputed press releases.  Plaintiffs move to strike Exhibit G on grounds that it is not relevant to their complaint and is of questionable evidentiary value.

As with the market commentary, the stock price information in Exhibit G is not pertinent to the issues currently before the court, and so are not considered.

**Facts in the memorandum of law.**  Plaintiffs also contend that defendants' memorandum of law relies on asserted facts drawn from beyond the four corners of the complaint.[1]  To the extent

---

[1]      In particular, plaintiffs contend that defendants impermissibly discuss StockerYale's shift from delivering prototype lasers to supplying production lasers, and argue that the press releases at issue were not false or misleading because they announced the start of regular shipments of production lasers – despite the absence of facts asserted in the complaint or text of the press releases to support such an argument.

that is the case, those facts not properly before the court will be disregarded.

## Motions to Dismiss

### 1.  The Legal Standard

A motion to dismiss for "failure to state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  When considering a motion to dismiss under FED. R. CIV. P. 12(b)(6), the court must "accept as true the factual allegations of the complaint and construe all reasonable inferences therefrom in favor of [plaintiff]."  Perry v. N.E. Bus. Serv., Inc., 347 F.3d 343, 344 (1st Cir. 2003) (citing Beddall, 137 F.3d at 16).  However, the court need not credit "claims that are made in the complaint if they are 'bald assertions' or 'unsupportable conclusions.'"  United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 224 (1st Cir. 2004) (quoting Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir. 2002)).  Finally, "[a] district court may grant a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted only if 'it clearly appears, according to the facts alleged, that the plaintiff cannot recover

on any viable theory.'"  Pomerleau v. W. Springfield Pub. Sch.,
362 F.3d 143, 145 (1st Cir. 2004) (quoting Correa-Martinez v.
Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990)).


    Because count one of plaintiffs' complaint has been brought
under section 10(b) of the Securities Exchange Act, it is subject
to a heightened pleading standard, set out in statute and rule.
Under the provisions of the Private Securities Litigation Reform
Act ("PSLRA") of 1995:

> In any private action arising under this chapter
> in which the plaintiff alleges that the defendant-
>
>    **(A)** made an untrue statement of material fact; or
>    **(B)** omitted to state a material fact necessary in
>    order to make the statements made, in light of the
>    circumstances in which they were made, not
>    misleading;
>
> the complaint shall specify each statement alleged to
> have been misleading, the reason or reasons why the
> statement is misleading, and, if an allegation
> regarding the statement or omission is made on
> information and belief, the complaint shall state with
> particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  Furthermore:

> In any private action arising under this chapter
> in which the plaintiff may recover money damages only
> on proof that the defendant acted with a particular
> state of mind, the complaint shall, with respect to
> each act or omission alleged to violate this chapter,
> state with particularity facts giving rise to a strong
> inference that the defendant acted with the required
> state of mind.

15 U.S.C. § 78u-4(b)(2).

The First Circuit has held that "[t]he PSLRA imposes requirements for pleading with particularity that are consistent with [the] circuit's prior rigorous requirements for pleading fraud with particularity under Fed.R.Civ.P. 9(b)." <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185, 188 (1st Cir. 1999).  According to Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Moreover, "[t]he particularity requirement is regarded by the Court of Appeals for this Circuit as being of fundamental importance."  <u>In re Boston Tech., Inc. Sec. Litig.</u>, 8 F. Supp. 2d 43, 52 (D. Mass. 1998).  The particularity "requirement 'entails specifying in the pleader's complaint the time, place, and content of the alleged false or fraudulent representations.'"  <u>Arruda v. Sears, Roebuck & Co.</u>, 310 F.3d 13, 19 (1st Cir. 2002) (quoting <u>Powers v. Boston Cooper Corp.</u>, 926 F.2d 109, 111 (1st Cir. 1991)).  In addition, "the complaint must set forth <u>specific facts</u> that make it reasonable to believe that the defendant knew that a statement was materially false or misleading.  The rule requires that the <u>particular times, dates, places, or other details</u> of the alleged fraudulent involvement of the actors be alleged."  <u>Boston Tech.</u>, 8 F. Supp. 2d at 53

(quoting Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st Cir. 1996) (emphasis added)).

Moreover, "[i]t is not the law that a 10b-5 complaint is to be judged on the basis of the general flavor derived from an issuer's collective statements over a long period of time." Boston Tech., 8 F. Supp. 2d at 56.  Rather, "[10b-5] allegations [must be organized] into discrete units that are, standing alone, each capable of evaluation." Id. at 55-56 (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992)).  However,

> the fact that a statement is literally accurate does not preclude liability under federal securities laws. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.  For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." McMahan v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir. 1990).  Under the foregoing standards, "emphasis and gloss can, in the right circumstances, create liability." Isquith v. Middle S. Utils., Inc., 847 F.2d 186, 203 (5th Cir. 1988).

Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 175 (1st Cir. 1994) (citations omitted).

Finally, "[u]nder the PSLRA, the complaint must state with particularity facts that give rise to a 'strong inference' of scienter, rather than merely a reasonable inference." Mesko v.

<u>Cabletron Sys., Inc</u> (<u>In re Cabletron Sys., Inc.</u>), 311 F.3d 11, 38
(1st Cir. 2002) (citing 15 U.S.C. § 78u-4(b)(2); <u>Greebel</u>, 194
F.3d at 195-96).  That is, "[i]t is clear that scienter
allegations now must be judged under the 'strong inference'
standard at the motion to dismiss stage."  <u>Greebel</u>, 194 F.3d at
197.


    <u>2.  Factual Background</u>

    StockerYale designs and manufactures lasers.  At all times
relevant to this suit, Mark Blodgett was StockerYale's Chairman
and Chief Executive Officer; Ricardo Diaz was StockerYale's Chief
Operating Officer; and Francis O'Brien was StockerYale's
Executive Vice President, Chief Financial Officer, and Treasurer.
Lawrence Blodgett was a StockerYale director.


    In July, 2002, StockerYale entered into an agreement with
BAE Systems ("BAE") to supply BAE with seven "reference lasers"
for "National Defense use," at a price of $91,350.  Two of the
lasers were to be delivered by September 13, 2002, with the
remaining five to be delivered by November 22, 2002.  (Pls.' Obj.
to Defs.' Mot. to Strike (document no. 27), Ex. 4.)


    On October 11, 2002, StockerYale issued a press release
which stated, in pertinent part:

> StockerYale, Inc. (NASDAQ: STKR), an independent
> supplier of photonics-based products, has been awarded
> a contract from BAE SYSTEMS to supply custom-designed
> thermoelectrically cooled lasers for their Advanced
> Threat Infrared Countermeasures (ATIRCM) system.
>
> StockerYale will initially supply several specialized
> lasers to the Nashua, N.H.-based Information &
> Electronic Warfare Systems (IEWS) business unit in the
> fourth quarter of 2002, with the opportunity for long-
> term deliveries through 2020.
>
> BAE SYSTEMS' ATIRCM is the next-generation
> countermeasure to protect military aircraft from
> infrared-guided missiles.  This system is currently
> designated for installation on the U.S. Army AH-64, UH-
> 60, CH-47, EH-60, and various other aircraft.

(Defs.' Mem. of Law (document no. 21), Ex. C.)  Plaintiffs allege
that the October 11 press release was intended to announce the
July, 2002, contract, but its reference to "long-term deliveries
through 2020" appears to be inconsistent with the July, 2002,
contract.  That contract called for only two deliveries, in
September and November, 2002.  Thus, it is not clear whether the
October 11 press release referred to StockerYale's July, 2002,
contract with BAE or to some other agreement between the two
companies.  Fortunately, however, that press release is not
central to plaintiffs' claims.

In December, 2003, StockerYale entered into another contract
with BAE, for "Repackaging of 2 ATIRCM Reference Lasers and
completion of 2 prototypes," at a price of $70,000.  The two

prototype units were scheduled for delivery by April 14, 2004. (Pls.' Obj. to Defs.' Mot. to Strike (document no. 27), Ex. 3.)

Unlike the July, 2002, contract, which specified that the subject lasers were for "National Defense use," the December, 2003, contract included no such specification, nor did it include a Defense Priority and Allocation Requirements ("DPAS") rating, which is required for contracts supporting both military and homeland security programs. The contract provided no other information regarding the uses to which the prototype lasers might be put.

On January 6, 2004, the United States Department of Homeland Security ("Homeland Security") announced that three contractors, including BAE, had each been awarded $2 million in Phase I of a project to determine the viability of technology designed to protect commercial aircraft against shoulder-fired missiles.

Upon learning of BAE's Homeland Security contract, Mark Blodgett directed StockerYale's Vice President of Corporate Marketing to prepare a press release announcing that the December, 2003, contract between StockerYale and BAE was connected to BAE's January, 2004, Homeland Security contract.

BAE gave StockerYale no information suggesting any such
connection, and the proposed press release was never issued.

In April, 2004, BAE placed an order with StockerYale for
twenty-one lasers, at a price of $200,000.[2]

On April 19, 2004, StockerYale issued a press release titled
"StockerYale Receives Order from BAE for Specialized Lasers
Integral to Military Missile Countermeasure Systems."  That press
release was subtitled: "The Company is Also Developing Customized
Lasers for Missile Countermeasure System on Commercial Planes."
It stated, in pertinent part:

> StockerYale, Inc. (NASDAQ: STKR - News), a leading
> independent provider of photonics-based products, has
> received a noteworthy order from BAE SYSTEMS to supply
> lasers that are integral to an airborne military
> missile defense system.  The Company's specialized
> lasers are part of the Advanced Threat Infrared

---

[2]     In paragraph 46 of the First Amended Complaint,
plaintiffs characterize the April, 2004, transaction as "a small
and financially immaterial order for 21 lasers worth about
$200,000 pursuant to the old previously announced July 2002
contract with BAE Systems."  However, the July, 2002, contract
between StockerYale and BAE was for the sale of only seven
lasers, the last of which were to be delivered by November 22,
2002.

Moreover, while plaintiffs cite paragraph fifteen of a
Securities and Exchange Commission ("SEC") complaint against
StockerYale as the basis for their characterization of the April,
2004, transaction as a delivery pursuant to the July, 2002,
contract, the SEC complaint actually refers to the April, 2004,
transaction as part of a separate contract between BAE and
StockerYale.

Countermeasure (ATIRCM) system, which is the next-generation countermeasure system designed to protect military aircraft from infrared-guided missiles.

The Company is also developing a customized laser for the development of a missile countermeasure system for commercial planes under a recent contract received from the Nashua, N.H.-based Information & Electronic Warfare Systems (IEWS) business unit of BAE.  This commercial missile defense system is an adaptation of the ATIRCM system concept.  BAE is one of three companies awarded a contract from the Department of Homeland Security to determine the feasibility of adapting the military missile-defense system for commercial planes.  If the systems can be adapted, design contracts will be awarded to one or two of the companies to build and test prototypes.

"We are pleased to have been chosen by BAE once again to participate in this important program designed to protect aircraft from attack by shoulder-launched missiles," said Mark W. Blodgett, StockerYale's chief executive officer.  "By successfully developing and delivering customized lasers for BAE's ATIRCM military system, StockerYale is well positioned to deliver a variation of this laser for use within this prospective commercial application."  Blodgett concluded, "We realize the importance and practical implications that such a commercial countermeasure system could have and look forward to supporting BAE on this project."

(Defs.' Mem. of Law (document no. 21), Ex. A.)


StockerYale did not seek BAE's approval of the April 19

press release, in violation of its obligation to do so under

established BAE corporate policy.  Moreover, at least one

StockerYale official (Luc Many, Senior Vice-President for Sales

and Marketing) counseled against issuing the press release, on

grounds that: (1) the April, 2004, order was "old news" resulting

14

from a 2002 contract; (2) StockerYale had not been able to verify
that its December, 2003, contract with BAE was related to BAE's
Homeland Security contract; and (3) BAE had not approved the
press release, and would find it unacceptable.  When BAE learned
of the April 19 press release, it notified StockerYale that the
two lasers it purchased pursuant to the December, 2003, contract
were not for uses related to its Homeland Security contract.
Moreover, StockerYale had not received <u>any</u> order related to BAE's
January, 2004, Homeland Security contract.

On April 19, 2004, the date of the press release quoted
above, StockerYale shares began trading at $1.43.  Shortly after
the press release was issued, the stock rose to a daily high of
$4.28, and closed at $4.15.  In after-hours trading that day,
StockerYale traded at a high of $6.04 per share.

On April 20, 2004, StockerYale opened at $6.70, hit a daily
high of $7.75, and closed at $3.74, after hitting a daily low of
$3.53.[3]  That same morning, Mark Blodgett sold $1.64 million
worth of StockerYale shares(at $6.56 per share).  Also that
morning, Lawrence Blodgett sold $352,000 worth of StockerYale
shares, in two blocks (at $6.12 per share and $7.19 per share).

---

[3]     Trading volume on April 20, 2004, was approximately 500
times greater than the average volume for the previous thirty
days.

Early in the morning of April 20, CNBC Nasdaq reporter Leslie Laroche contacted StockerYale's Vice President for Corporate Marketing, James Gargas, and inquired about the "new orders" reported in the April 19 press release.  Gargas told Laroche that the order had not resulted from a new contract, but was related to an existing contract with BAE, announced to the public in October, 2002.  He also told Laroche that StockerYale was providing BAE with prototype lasers for its contract to develop a prototype system to protect aircraft from shoulder-launched lasers.

At approximately 1:05 p.m. on April 20, after the Blodgetts had made their trades, Laroche broadcast a report on the April 19 press release, telling viewers that she had learned that StockerYale had not received a new contract, but was merely filling orders under an old, previously announced agreement with BAE.  After that report aired, StockerYale shares fell from their daily high of $7.75 to a closing price of $3.74.

On April 21, 2004, after the close of trading, presumably in response to the CNBC report and/or the information StockerYale received from BAE, StockerYale issued another press release, titled "StockerYale Provides Additional Information with Respect

to Orders Received from BAE."  That release, issued at Mark

Blodgett's direction, stated, in pertinent part:

> StockerYale, Inc. (NASDAQ: STKR – News), a leading
> independent provider of photonics-based products
> provides additional information with respect to orders
> received from BAE.
>
> StockerYale's press release of April 19, 2004
> referenced two orders that the Company had received
> from BAE Systems.
>
> The Company wishes to provide additional information
> with respect to the terms of those orders.
>
> The first order mentioned was a production order from
> BAE under its contract with the U.S. government to
> supply an airborne military defense system against
> heat-seeking missiles.  BAE was awarded that contract
> in October 2002 and in a press release dated October
> 11, 2002 the Company announced that it had been awarded
> a contract from BAE to supply the Company's
> thermoelectrically cooled laser to BAE for its ATIRCM
> program.  The contract that BAE has with the U.S.
> government calls for deliveries through 2020 and
> StockerYale expects to receive additional orders under
> this contract.
>
> The second order that the Company received from BAE
> Systems was an order for the delivery of customized
> lasers for an adaptation of the military ATIRCM system
> for use on commercial or military airplanes.

(Defs.' Mem. of Law (document no. 21), Ex. B.)


While the April 21 press release represented that

StockerYale was supplying lasers to BAE pursuant to an agreement

between BAE and the U.S. Government that called for deliveries

from BAE to the government through 2020, the actual completion

date of BAE's contract to deliver ATIRCM systems is July 14, 2007.

When it learned of the April 21 press release, one day after it was issued, BAE complained to StockerYale that both press releases were inaccurate, and insisted that StockerYale remove them from the company's web site.  StockerYale complied immediately, but never fully corrected the misrepresentations contained in the two press releases.

At the close of trading on April 21, before the April 21 press release was issued, StockerYale shares were trading at $3.17.  StockerYale opened at $4.81 on April 22, and reached a daily high of $4.99 before closing at $3.68.  On May 24, 2005, the last day of the class period, StockerYale closed at $0.76 per share.

Also on May 24, 2005, the SEC filed a civil action against Mark Blodgett and StockerYale, alleging violations of section 10(b) of the Exchange Act and Rule 10b-5, based on the issuance of the April 19 and 21 press releases.[4]  That action resulted in

---

[4]    The SEC first informed StockerYale of its investigation on August 6, 2004.  On August 10, 2004, StockerYale issued a Form 8-K disclosing the SEC's investigation into the two press releases.  When the investigation was disclosed to the public, StockerYale shares reached a low of $0.84 in after-hours trading.

consent judgments against Blodgett and StockerYale under which Blodgett was ordered to pay disgorgement of $754,877 and a civil penalty of $120,000, and both StockerYale and Mark Blodgett were enjoined from committing any further violations of section 10(b).

This action followed.  In it, plaintiffs claim that the April 19 press release was false and misleading because it stated that: (1) StockerYale was developing a customized laser for a missile countermeasure to protect commercial aircraft; (2) StockerYale was doing so as part of a Homeland Security project; and (3) StockerYale had received an order from BAE to supply lasers to protect commercial aircraft.  Plaintiffs further claim that the April 21 press release was false and misleading because it reiterated the misrepresentations stated in the April 19 press release and further misrepresented that BAE had a contract to deliver military missile-defense systems to the U.S. government through 2020.

### 3.  StockerYale and Mark Blodgett (document no. 20)

Defendants[5] move to dismiss Count I, plaintiffs' section 10(b) claim, on grounds that: (1) every statement in the April, 2004, press releases was either an accurate statement of

---

[5]     Throughout this section, the term "defendants" is used to refer to StockerYale and Mark Blodgett.

historical fact, an expression of opinion or belief, or a
forward-looking statement accompanied by meaningful cautionary
language; (2) plaintiffs fail to allege sufficient facts to
support a strong inference of scienter; and (3) plaintiffs do not
adequately plead loss causation.  Defendants also move to dismiss
Count II on grounds that plaintiffs' failure to state a claim
under section 10(b) necessarily requires dismissal of their
section 20A claim.  Mark Blodgett moves to dismiss Count III on
grounds that plaintiffs have failed to allege facts establishing
that he is subject to control person liability.


### A.   Count I – The Section 10(b) Claim

Section 10(b) of the Securities Exchange Act of 1934
provides:

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce or of the mails, or of any
> facility of any national securities exchange–
>
> . . .
>   **(b)** To use or employ, in connection with the
> purchase or sale of any security registered on a
> national securities exchange or any security not
> so registered, or any securities-based swap
> agreement (as defined in section 206B of the
> Gramm-Leach-Bliley Act), any manipulative or
> deceptive device or contrivance in contravention
> of such rules and regulations as the Commission
> may prescribe as necessary or appropriate in the
> public interest or for the protection of
> investors.

15 U.S.C. § 78j.  Rule 10b-5, promulgated by the SEC, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  "The Supreme Court has described the 'basic elements' of a claim under Rule 10b-5 as including: (1) 'a material misrepresentation (or omission)'; (2) 'scienter, i.e., a wrongful state of mind'; (3) 'a connection with the purchase or sale of a security'; (4) 'reliance'; (5) 'economic loss'; and (6) 'loss causation.'"  Brody v. Stone & Webster, Inc. (In re Stone & Webster, Inc., Sec. Litig.), 414 F.3d 187, 193 (1st Cir. 2005) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005) (emphasis omitted); citing Wortley v. Camplin, 333 F.3d 284, 294 (1st Cir. 2003); Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001)).

A statement is false or misleading if the person making it has actual factual knowledge, at the time of the statement, that makes the statement false or misleading.  See, e.g., Cabletron, 311 F.3d at 36; Aldridge v. A.T. Cross Corp., 284 F.3d 72, 79 (1st Cir. 2002).

> In the First Circuit, "general averments of defendants' knowledge of material falsity [do] not suffice." Gross, 93 F.3d at 991.  A 10b-5 plaintiff must allege "details of [defendants'] alleged fraudulent involvement," including specifics as to what defendants had knowledge of and when.  Id.  To satisfy this requirement, complaints typically identify internal reports, memoranda, or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time.  See, e.g., Serabian [v. Amoskeag Bank Shares, Inc.], 24 F.3d [357,] 368 [(1st Cir. 1994)] (plaintiffs, "cit[ing] to reports and documents presented to defendants at relevant times that were inconsistent with the defendants' public statements . . . satisfies the necessary pleading requirements.")  Moreover, such citation must be "specifically" made.  Id.  Recently, in Shaw [v. Digital Equip. Corp.], 82 F.3d 1194 (1st Cir. 1996)], the Court ruled that merely alleging the existence of a highly efficient reporting system – even one that would logically lead to internal reports on the relevant subject matter – was not enough.  The Court wrote that such allegations "may speak to the question of how defendants might have known what they allegedly knew, but [they are insufficient] absent some indication of the specific factual content of any single report generated by the alleged reporting system."  82 F.3d 1224 & n. 38 (emphasis in original).

Boston Tech., 8 F. Supp. 2d at 57-58 (footnote omitted).

"Liability under section 10(b) and Rule 10b-5 also requires scienter, 'a mental state embracing intent to deceive,

manipulate, or defraud.'" <u>Cabletron</u>, 311 F.3d at 38 (quoting
<u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976)).  "To
prove scienter, a plaintiff "must show either that the defendants
consciously intended to defraud, or that they acted with a high
degree of recklessness."  <u>Stone & Webster</u>, 414 F.3d at 193
(quoting <u>Aldridge</u>, 284 F.3d at 82).  However, "this circuit has
rejected any rigid formula for pleading scienter, preferring to
rely on a 'fact-specific approach' that proceeds case by case."
<u>Cabletron</u>, 311 F.3d at 38 (citing <u>Aldridge</u>, 284 F.3d at 82;
<u>Greebel</u>, 194 F.3d at 196).

### <u>1.  The April 19 Press Release</u>

Based on a statement-by-statement analysis, defendants argue
that every sentence in the April 19 press release is literally
true, and say they cannot be held liable for plaintiffs'
misinterpretation of their accurate statements.  That claim is of
questionable merit, given the fact that the press release
represented that StockerYale was "developing a customized laser
for the development of a missile countermeasure system for
<u>commercial planes</u> <u>under a recent contract</u> received from the
Nashua, N.H.-based Information & Electronic Warfare Systems
(IEWS) business unit of BAE" – an assertion that BAE flatly
rejected as false.  Nevertheless, even if each of the individual
sentences in the April 19 press release was literally accurate,

and even though the press release "nowhere states that the prototype laser is being funded by monies from the [Homeland Security]," (Defs.' Mem. of Law (document no. 21) at 10), that press release plainly suggested that StockerYale had a contract with BAE to provide BAE with lasers for BAE to use in fulfilment of a Homeland Security contract.  The press release expressly stated that "BAE [was] one of three companies awarded a contract from the Department of Homeland Security," and the only plausible reason for StockerYale to include a reference to BAE's Homeland Security contract in a press release announcing StockerYale's contract with BAE is to imply a connection between StockerYale's contract with BAE and BAE's contract with Homeland Security. Because plaintiffs have adequately alleged that the customized lasers StockerYale agreed to sell BAE in December, 2003, were not for BAE's Homeland Security project, they have adequately alleged that the April 19 press release contained a false or misleading statement.

However, under the relevant pleading standard, that is not enough to survive defendants' motion to dismiss.  Not only must plaintiffs allege a false statement, they must also allege, with factual support, that the person making the statement knew it was false.  The facts alleged, if proven, would establish that

defendants did not know that the prototype lasers were for use in BAE's Homeland Security project, yet implied that they were.

The complaint adequately alleges that StockerYale did not know that the lasers in question would be used by BAE in its Homeland Security project as part of a system to protect commercial aircraft, and had no reason to think, or represent, that they would be.  Obviously, the positive implication was fraught with economic significance.  As it turns out, the baseless implication was not just misleading, it was actually false.  The allegations in the complaint are sufficient to support a claim that StockerYale knew that the press release contained false or misleading information at the time it was issued, because it knew that there was no reasonable basis to make the misleading and deceptive statements (or, at a minimum, implications) that it stood to gain substantially from BAE's governmental contracts.  Moreover, even if those allegations are insufficient to support a claim that StockerYale consciously intended to defraud, they are certainly sufficient to support a claim that it acted with a high degree of recklessness.  See, e.g., Aldridge, 284 F.3d at 82; Greebel, 194 F.3d at 198-201.

Because plaintiffs have adequately alleged defendants' contemporaneous possession of facts that established the false or

misleading nature of the April 19 press release (i.e., that
nothing supported the clear implications disseminated),
defendants are not entitled to dismissal of Count I as it relates
to the April 19 press release.

### 2.  The April 21 Press Release

Plaintiffs make two claims concerning the April 21 press
release.  They say it misrepresented the duration of BAE's
October, 2002, agreement with the U.S. government to supply an
airborne military defense system against heat-seeking missiles,
and that it perpetuated the false statements in the April 21
press release concerning the relationship between the
StockerYale-BAE contract and the BAE-Homeland Security contract.

Plaintiffs adequately allege the falsity of StockerYale's
statement that "[t]he contract that BAE has with the U.S.
government calls for deliveries through 2020," by citing a
Department of Defense press release that listed January 14, 2007,
as the completion date of BAE's ATIRCM contract.  Plaintiffs have
also alleged facts from which it would be reasonable to infer
that Mark Blodgett and/or other StockerYale employees knew very
well that the representations regarding BAE's ATIRCM contract,
including its termination date, had no substantial basis in facts
known to them — that is, the stated facts were simply invented by

26

StockerYale.  Accordingly, liability for the statement in the
April 21 press release concerning the duration of BAE's ATIRCM
contract with the U.S. government, is adequately pled.

Plaintiffs' second claim regarding the April 21 press
release also survives defendants' motion to dismiss.  As
explained above, plaintiffs adequately allege that the April 19
press release misleadingly suggested that StockerYale was
providing lasers to BAE for BAE's use in fulfilling its Homeland
Security contract.  Plaintiffs also allege that after BAE
learned of the April 19 press release, a BAE representative
advised StockerYale that the December, 2003, contract between
StockerYale and BAE was not connected with BAE's January, 2004,
Homeland Security contract.  Given that information, plaintiffs
argue that it was false or misleading for StockerYale to state,
in the April 21 press release, that "[t]he second order the
Company received from BAE Systems [i.e., the December, 2003,
order] was an order for the delivery of customized lasers for an
adaptation of the military ATIRCM system for use on commercial or
military airplanes."

Plaintiffs have alleged facts from which it would be
reasonable to infer that pertinent StockerYale officials had no
basis for claiming that the lasers StockerYale provided under the

27

December, 2003, agreement were for use in an adaptation of BAE's
military ATIRCM system for commercial or military airplanes.  In
the aftermath of the April 19 press release, which falsely
implied that StockerYale was providing lasers for use BAE's
Homeland Security project – a project directed toward the
protection of commercial airplanes – the April 21 statement that
StockerYale was providing lasers for BAE's adaptation of ATIRCM
lasers for military or commercial use was tantamount to a
statement that StockerYale was providing lasers for BAE's
Homeland Security project.  Because StockerYale is alleged to
have known, before the April 21 press release was issued, that
BAE was not using StockerYale lasers for its Homeland Security
project, plaintiffs have adequately alleged both the falsity of
the April 21 press release and StockerYale's knowledge of that
falsity.


     StockerYale has also adequately alleged scienter.
"[E]vidence of conscious wrongdoing . . . may provide the
'something more' necessary to prove scienter." Cabletron, 311
F.3d at 39 (quoting Greebel, 194 F.3d at 201; citing A. Morales
Olazabal, The Search for "Middle Ground": Towards a Harmonized
Interpretation of the Private Securities Litigation Reform Act's
New Pleading Standard, 6 STAN. J.L. BUS. & FIN. 153, 187–88 (2001)
("[T]he obvious should not go unstated, and that is that

allegations of intentionally fraudulent conduct also will permit the drawing of a strong inference of scienter.")).

Here, plaintiffs allege that StockerYale was told, directly by BAE, that StockerYale's lasers were not being used as part of BAE's Homeland Security project.  But, rather than stating that in its April 21 press release, StockerYale held to its earlier statement that it was providing lasers for BAE's adaptation of its ATIRCM system for use on military or commercial airplanes – a project identified as a Homeland Security project in the April 19 press release.  That is, although StockerYale did not include a Homeland Security reference in its April 21 press release, it did not expressly disclaim a connection with BAE's Homeland Security project, even when given substantial reason to believe that readers of the April 19 press release would have concluded that StockerYale was claiming it provided lasers for BAE's Homeland Security project.  Thus, plaintiffs' "complaint survives the requirement that its pleadings raise a strong inference of scienter."  Aldridge, 284 F.3d at 83 (explaining that "the fact that the defendants published statements when they knew facts suggesting that statements were inaccurate or misleadingly incomplete is classic evidence of scienter") (citing State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 665 (8th Cir. 2001)).

Moreover, defendants' failure to seek BAE's prior approval of the April 21 press release demonstrated a "high degree of recklessness," <u>Stone & Webster</u>, 414 F.3d at 193 (citation omitted), given StockerYale's established obligation to do so and BAE's interest in the subject matter, as evidenced by BAE's quick response to the April 19 press release.

Finally, plaintiffs have adequately alleged loss causation. Defendants suggest that plaintiffs fail to allege loss causation because the allegation that defendants never corrected misinformation in the two press releases precludes them from alleging a necessary element of loss causation, namely that revelation of defendants' misrepresentation caused StockerYale stock to drop in value.  Defendants further argue that the factual allegations in plaintiffs' complaint do not adequately eliminate company-specific developments and industry-wide market factors as potential reasons for the fluctuations in the price of StockerYale shares during the class period.  Even under the relatively strict standard imposed by <u>Dura</u>, 544 U.S. 336, plaintiffs have adequately alleged loss causation.

In <u>Dura</u>, the Supreme Court rejected "a Ninth Circuit holding that a plaintiff can satisfy [the loss causation] requirement . . . simply by alleging in the complaint and subsequently

establishing that 'the price' of the security 'on the date of
purchase was inflated because of the misrepresentation.'"  544
U.S. at 344 (quoting 339 F.3d 933, 938 (9th Cir. 2003)) (emphasis
omitted).  Instead, the Supreme Court held that "a person who
'misrepresents the financial condition of a corporation in order
to sell its stock becomes liable to a relying purchaser 'for the
loss' the purchaser sustains 'when the facts . . . become
generally known' and 'as a result' share value 'depreciate[s].'"
544 U.S. at 344 (quoting RESTATEMENT (SECOND) OF TORTS § 548A, cmt.
b, at 107) (1977)).

     Notably, the rule in <u>Dura</u> does not require that the party
accused of making a misrepresentation also be the source of
corrective information that results in a decline in stock prices.
Plaintiffs' allegation that defendants themselves never corrected
the misinformation contained in the April 21 press release does
not preclude pleading loss causation.  Moreover, plaintiffs do
allege that StockerYale shares dropped fifteen percent, to $1.27
per share, on the day the SEC informed StockerYale it was
investigating the accuracy of the two press releases.  And, they
further allege that when the public was informed of the SEC
investigation, by means of a Form 8-K filed by StockerYale, its
stock dropped to $0.84 per share in after-hours trading.  That is
enough to meet the requirements established in <u>Dura</u> concerning

the causal connection between the release of corrective information and the decline in the price of StockerYale shares.

Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal, given the factual allegations discussed above.  Similarly, the possible existence of trends in the industry at the time of the run-up in StockerYale share prices presents an issue of fact, but does not overcome plaintiffs' properly supported allegation of a rise in stock prices directly after and attributable to the April 19 and 21 press releases.

Because plaintiffs have adequately alleged the false or misleading nature of the April 19 and 21 press releases, defendants' scienter, and loss causation, defendants are not entitled to dismissal of Count I.

### B.  Count II - The Section 20A Claim

Defendants' only argument concerning plaintiffs' section 20A claim is that dismissal of the section 10(b) claim requires dismissal of the section 20A claim.  That is a correct statement of the law:

> To state a claim for insider trading, the
> plaintiffs must have adequately alleged a violation of
> the Exchange Act.  See, e.g., [In re] Advanta Corp.
> [Sec. Litig.], 180 F.3d [524,] 541–42 [(3d Cir. 1999)]
> ("claims under section 20(A) are derivative, requiring
> proof of a separate underlying violation of the
> Exchange Act"); Jackson Nat. Life Ins. Co. v. Merrill
> Lynch & Co., Inc., 32 F.3d 697, 703 (2d Cir. 1994)
> ("[T]o state a claim under § 20A, a plaintiff must
> plead a predicate violation of the '34 Act or its rules
> and regulations"); Colby [v. Hologic, Inc.], 817 F.
> Supp. [204,] 215 [(D. Mass. 1993)] (insider trading
> claim deficient: plaintiff "has not sufficiently
> alleged what 'materially adverse information' any
> defendant possessed during the 'class period' and hence
> there can be no duty to avoid trading or to make
> disclosure to equalize knowledge of insiders and the
> investing public").  Because the plaintiffs have not
> stated a claim under Section 10(b), their Section 20A
> claim also fails.

Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235,

257 (D. Mass. 2001).  Here, however, plaintiffs' section 10(b)

claim has not been dismissed.  Accordingly, Mark Blodgett is not

entitled to dismissal of Count II.


### C. Count III – The Section 20(a) Claim

Mark Blodgett argues that the section 20(a) claim against

him must be dismissed because plaintiffs make only boilerplate

allegations against him, rather than concrete allegations that he

controlled the content and issuance of the disputed press

releases in a way that could subject him to "control person"

liability.  Blodgett's argument is without merit.

33

The "control person" liability section of the Securities and Exchange Act (section 20(a)), provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Stone & Webster, 414 F.3d at 194 n.3 (quoting 15 U.S.C. § 78t(a)).  "The elements of § 20(a) are generally stated to be (i) an underlying violation of the same chapter of the securities laws by the controlled entity, . . . and (ii) control of the primary violator by the defendant."  Id. at 194(citing 15 U.S.C. § 78t(a); Aldridge, 284 F.3d at 84–85).

Here, plaintiffs' section 20(a) claim against Mark Blodgett is not based on mere boilerplate assertions concerning Blodgett's position with StockerYale.  Rather, plaintiffs allege that Blodgett regularly directed the drafting and issuance of StockerYale press releases, including the one dated April 21. That is more than sufficient to state a claim under section 20(a).

### 4.  Lawrence Blodgett, Diaz, and O'Brien (document no. 22)

Lawrence Blodgett is a defendant in Count II (section 20A, insider trading), while Diaz and O'Brien are defendants in Count III (section 20(a), control person liability).

Lawrence Blodgett is not entitled to dismissal of the claim against him for the same reasons that Mark Blodgett is not entitled to dismissal of Count II.

Diaz and O'Brien move to dismiss the section 20(a) claim against them on grounds that plaintiffs have failed to: (1) state an underlying section 10(b) claim; (2) adequately allege that Diaz and O'Brien were control persons within the meaning of section 20(a); and (3) allege facts giving rise to a strong inference that Diaz and O'Brien acted with scienter.

As discussed above, plaintiffs have adequately alleged section 10(b) claims.  As the court of appeals for this circuit recently explained, "§ 20(a) does not on its face obligate the plaintiff to plead or prove scienter (or any other state of mind) on the part of the controlling persons named as a defendant." Stone & Webster, 414 F.3d at 194 (footnote omitted).  Thus, the only possible ground for dismissal is the argument that

35

plaintiffs have failed to adequately allege that Diaz and O'Brien were control persons.

For purposes of the statute under which plaintiffs seek to hold Diaz and O'Brien liable,

> [t]he term "control" (including the terms "controlling," "controlled by," and "under common control with") means under the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 240.12b-2. "Ordinarily, '[c]ontrol is a question of fact' not to be 'resolved summarily at the pleading stage.'" Brumbaugh v. Wave Sys. Corp., 416 F. Supp. 2d 239, 259 (D. Mass. 2006) (quoting Cabletron, 311 F.3d at 41 (citation omitted)).

Diaz and O'Brien argue that plaintiffs' assertion of a claim for control person liability rests on little more than a boilerplate allegation that Diaz and O'Brien were corporate officers, and that more is required, including allegations that Diaz and O'Brien participated in drafting or issuing the press releases at issue here.  Defendants read the complaint too narrowly, ignoring some of plaintiffs' factual allegations, and they read the law concerning control person liability too

broadly, effectively transforming control person liability into direct liability.

Plaintiffs do not simply allege that Diaz and O'Brien were officers of StockerYale; they also allege that both were directly responsible for the day-to-day management of the company, possessed the power and authority to control the content of StockerYale's press releases, and were provided copies of the two press releases before they were issued or shortly thereafter, thus giving them the opportunity to prevent issuance or cause them to be corrected. So, this is not a case in which control person liability is premised solely on a defendant's corporate title.

Diaz and O'Brien base their motion to dismiss on plaintiffs' failure to allege facts establishing their direct involvement in drafting or issuing the two StockerYale press releases, but a plaintiff need not make such allegations to state a claim under section 20(a). See, e.g., In re Allaire Corp. Sec. Litig., 224 F. Supp. 2d 319, 341 (D. Mass. 2002) ("Control person liability, unlike primary liability, does not require that individuals have issued the false or misleading statements, but merely that the individuals have controlled the entity that issued the statements.").

To be sure, Diaz and O'Brien may defend against plaintiffs' control person liability claim, but

> Unlike Rule 10b-5, § 20(a) does not on its face obligate the plaintiff to plead or prove scienter (or any other state of mind) on the part of the controlling persons named as a defendant.  Instead, the burden is shifted.  The defendant can rebut liability by proving that he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

Stone & Webster, 414 F.3d at 194 (quoting 15 U.S.C. § 78t(a)); see also Donohoe v. Consol. Operating & Prod. Corp., 30 F.3d 907, 912 (7th Cir. 1994) ("because good faith was an affirmative defense to control person liability, the burden of proving good faith was on the defendants") (emphasis in the original).  But of course, a plaintiff is under no obligation to plead the facts necessary to negate an affirmative defense that may (or may not) be raised.  Thus, defendants have raised no viable challenge to plaintiffs' claim under section 20(a).

Because plaintiffs have alleged facts sufficient to establish their claim for control person liability against Diaz and O'Brien, Diaz and O'Brien are not entitled to dismissal Count III.

## Conclusion

For the reasons given, plaintiffs' motion to strike (document no. 24) is granted and both motions to dismiss (document nos. 20 and 22) are denied.


**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

September 27, 2006

cc:  Mark L. Mallory, Esq.
     Christine Friedman, Esq.
     Jennifer A. Eber, Esq.
     William L. Chapman, Esq.
     Laurence Rosen, Esq.
     Alexander J. Walker, Esq.
     Francis G. Kelleher, Esq.
     Inez H. Friedman-Boyce, Esq.
     R. Todd Cronan, Esq.
     Stephen R. Galoob, Esq.
     Douglas C. Doskocil, Esq.